For the reasons set forth in the opinion accompanying this order;

IT IS this 28th day of June, 1991 hereby

ORDERED that plaintiff's motion for summary judgment is DENIED WITH PREJUDICE and defendant Continental's motion for summary judgment is GRANTED.

No costs.

**MYLAN LABORATORIES, INC., Plaintiff,**

v.

**AKZO, N.V., et al., Defendants.**

**Civ.A. No. R–90–1096.**

United States District Court, D. Maryland.

Aug. 15, 1991.

Donald J. Mulvihill, Cahill, Gordon & Reindel, Washington, D.C., for Akzo N.V. and Pharmaceutical Basics, Inc.

Richard M. Cooper, Richard S. Hoffman, David Kiernan, Williams & Connolly, Washington, D.C., for Par Pharmaceutical, Inc. and Quad Pharmaceuticals, Inc.

Ty Cobb, Janet L. McDavid, Hogan & Hartson, Washington, D.C., for American Therapeutics, Inc.

John Sullivan, Lord Day & Lord, Barrett Smith, New York City, for Vitarine Pharmaceuticals, Inc.

Irv Nathan, David Nicoli, Arnold & Porter, Washington, D.C., for American Home Products Corp. and Quantum Pharmics, Ltd.

Hamilton P. Fox, III, Sutherland, Asbill & Brennan, Washington, D.C., for Raj Matkari and Steven Colton.

Andrew Krulwich, Walter Andrews, Wiley, Rein & Fielding, Washington, D.C., for Ashok Patel.

Steve Salky, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., for Dilip Shah.

James E. Rocap, III, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Raju Vegesna.

Walter Kletch, pro se.

Jan T. Sturm, pro se.

W. Stephen Cannon, Wunder, Ryan, Cannon, & Thelen, Washington, D.C., and Price O. Gielen, Neuberger, Quinn & Gielen, Baltimore, Md., for plaintiff Mylan Labs.

## MEMORANDUM AND ORDER

RAMSEY, District Judge.

Pending before the Court in the above-captioned case are twelve motions to dismiss filed by fifteen of the nineteen defendants.[1] The issues have been extensively briefed by the parties, and oral argument was had on April 12, 1991. The motions are now ripe for consideration by the Court.

### I. FACTS

The facts of this case, as alleged in Mylan's First Amended Complaint [Complaint], are as follows: Plaintiff Mylan Laboratories, Inc., is a corporation organized under the laws of Pennsylvania and is in the business of developing, manufacturing, selling, and distributing prescription drugs. Mylan sells both innovator drugs, new drugs developed and patented by the company, and generic drugs, duplicates of innovator drugs no longer covered by patents.

Defendants Akzo, N.V. [Akzo], Pharmaceutical Basics, Inc. [PBI], Par Pharmaceuticals, Inc. [Par], Quad Pharmaceuticals, Inc. [Quad], American Therapeutics, Inc. [ATI], Vitarine Pharmaceuticals, Inc. [Vitarine], American Home Products Corporation [AHP], and Quantum Pharmics, Ltd. [Quantum] are all corporations also in the business, whether directly or through a subsidiary, of developing, manufacturing, selling, and distributing prescription drugs, specifically generic prescription drugs. Defendants Raj Matkari, Ashok Patel, Dilip Shah, Raju Vegesna, Mohammed Azeem, Steven Colton, and Jun–Shung Chang are or were, at all relevant times, employees or officers of the various corporate defendants. At times throughout this opinion these defendants shall collectively be called the "manufacturer defendants."

Defendants Charles Chang, David Brancato, Walter Kletch, and Jan Sturm are or were, at all relevant times, scientists and

---

1. Motions to dismiss were filed by defendants Akzo N.V., Pharmaceutical Basics, Inc., Par Pharmaceuticals, Inc., Quad Pharmaceuticals, Inc., American Therapeutics, Inc., Vitarine Pharmaceuticals, Inc., Raj Matkari, Ashok Patel, Dilip Shah, Raju Vegesna, American Home Products Corporation, Quantum Pharmics, Ltd., Walter Kletch, Jan Sturm, and Stephen Colton. Mohammed Azeem, Charles Chang, David Brancato, and Jin–Shung Chang, none of whom are represented by counsel in this matter, did not file motions.

employees of the Food and Drug Administration [the FDA] and worked in the Division of Generic Drugs of the FDA. These defendants shall be referred to as the "FDA defendants."

Mylan describes the generic drug market as one of "intense competition." Complaint para. 44. It is, of course, heavily regulated, and a drug may not be marketed to the public until it has received FDA approval. 21 U.S.C. § 355(a). Two FDA divisions, the Division of Generic Drugs and the Division of Bioequivalence Review, are responsible for the processing of all abbreviated new drug applications [ANDAs] for generic drugs. This processing is supposed to occur on a first-in, first-out basis: "*i.e.,* the first ANDA submitted to the FDA which satisfactorily passed the labeling, bioequivalency, and chemistry reviews would receive the first approval for a particular generic drug." Complaint para. 55. Mylan states that

"Generally, the most critical element in determining the ability of a firm to compete successfully in the sale of a particular generic drug is the firm's rank in the FDA approval process. The firm which receives the first approval for a particular generic drug is virtually assured of achieving a significant share of sales of that product simply because it has the opportunity to supply all the initial pipeline demand. However, of equal importance, the first firm to sell a generic product generally maintains a relatively large share of the sales even after other generic formulations receive FDA approval. [ ...] The first firm, and to a lesser degree the other firms receiving early approvals, can maintain significant shares if they meet the competitive pricing of subsequent entrants."

Complaint para. 44.

Mylan alleges that from 1984 through 1989 (approximately), the named manufac-

turer defendants [2] paid illegal gratuities to the FDA defendants in order to facilitate and/or accelerate FDA approval of the manufacturers' ANDAs. Mylan also alleges that these defendants (manufacturers and FDA) delayed or impeded processing and approval of the ANDAs of Mylan and others, that the manufacturer defendants submitted false information to the FDA, and that the FDA defendants provided secret information (gleaned from the applications of Mylan and others) to the manufacturer defendants.[3]

Mylan's First Amended Complaint, filed in this Court on July 26, 1990, is 41 counts and 255 pages long. Counts 1 through 3 allege violations of RICO, 18 U.S.C. §§ 1962(c), 1962(a) and 1962(d). Counts 4 through 40 allege violations of § 1 of the Sherman Act: count 4 alleges a conspiracy among all the defendants; counts 5 through 40 allege conspiracies among various combinations of defendants depending on which drugs each manufactured. Count 41 is a state law claim for unfair competition and malicious interference with business relations; this count is asserted against all defendants.

## II. THE MOTIONS TO DISMISS

Defendants seek to dismiss counts 1 through 40 of plaintiff's complaint. The arguments range from perceived procedural flaws (Mylan has failed to provide defendants with a short and plain statement of its claim) to fundamental substantive issues (Mylan has failed to allege an antitrust injury or a RICO pattern). The majority of the issues relate to all of the defendants, and the Court will address the arguments collectively; to the extent that there are any distinguishing factors related to any one defendant, the Court will note these distinctions in the appropriate sections of this Memorandum.

---

2. Mylan also alleges the existence of additional unnamed conspirators whose existence and identity is not relevant to the present motion.

3. Most, if not all, of Mylan's factual allegations have been gleaned from the records of the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the House of Representatives which investigated the

FDA generic drug scandal. The information obtained in the course of this investigation was submitted to the United States Attorney for the District of Maryland, who proceeded to file criminal charges against certain of the defendants in this case. To date, all defendants charged, both corporate and individual, have pled guilty.

## III. STANDARDS GOVERNING MOTIONS TO DISMISS

A motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., is a means for testing the legal sufficiency of a complaint. When deciding the motion, a court must take all well-pleaded material allegations of the complaint as admitted, but conclusions of law or unwarranted deductions of fact are not admitted. A complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not sufficient to support the claim presented. However, a Rule 12(b) motion to dismiss "presumes that general allegations embrace those specific facts that are necessary to support the claim," *Lujan v. National Wildlife Federation*, — U.S. ——, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), and "a complaint should not be dismissed for insufficiency *unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim."* 2A Moore's Federal Practice § 12.08 at 2271–74 (2d Ed.1983) (emphasis in original).

## IV. PROCEDURAL PRELIMINARIES

### A. *Mylan's Argument*

Mylan argues that the motions to dismiss of defendants Akzo, PBI, Par, Matkari, Patel, Shah and Vegesna are not properly before this Court as they do not comply with Fed.R.Civ.P. 12(g) and (h)(2). These defendants had responded to Mylan's original complaint with Rule 12 motions raising the defenses of lack of personal jurisdiction, improper venue, insufficiency of process, and insufficiency of service. After the action was transferred to this Court and Mylan filed its amended complaint, these defendants, with the exception of Akzo, withdrew their first motions and then filed the motions now at issue. Akzo refiled its jurisdictional motion and also, with defendant PBI, filed a 12(b)(6) motion. Defendants ATI and Quad had answered the original complaint, asserting the 12(b)(6) defense, but did not answer the amended complaint choosing instead to file a 12(b)(6) motion.

While Mylan may be technically correct in its reading of the rules, this Court will exercise its discretion to entertain the motions filed. "A complaint is always vulnerable to a challenge for legal sufficiency[, and] it is far more efficient to treat the arguments prior to more extensive discovery." *Dart Drug Corp. v. Corning Glass Works*, 480 F.Supp. 1091, 1095 n. 3 (D.Md.1979). Rule 12(h)(2) specifically preserves the Rule 12(b)(6) defense against waiver; though 12(h)(2) lists specific points in time when the 12(b)(6) defense can be raised, courts have applied the rule permissively and allowed the 12(b)(6) defense to be raised at other times as well.

> "Since the basic purpose of Rule 12(h)(2) probably is to preserve the defenses, rather than delimit the mechanism for their assertion, this [ ] approach seems sound and within the spirit, if not the letter, of the provision."

5A Wright and Miller, *Federal Practice and Procedure: Civil* 2d, § 1392 at 762 (1990). *See also Thorn v. New York City Dept. of Social Services*, 523 F.Supp. 1193, 1196 n. 1 (S.D.N.Y.1981) (Defendants' 12(b)(6) motion untimely under 12(g) since a motion objecting to venue had previously been made; nonetheless, 12(b)(6) motion considered by the court as "it was not interposed for delay, and its consideration will expedite the disposition of the case on the merits." Also, other defendant's motion was timely and raised same issues which would therefore need resolution in any case).

Given the extensive briefing on the substantive issues in this case, and the fact that these same issues are also raised by the motions of Viterine, AHP and Quantum, there is no prejudice to Mylan by the Court's decision to consider the motions.

As the Court has not considered the extra-pleading material included in defendants' motions, there is no need to address Mylan's arguments regarding the propriety of such consideration.

### B. *Defendants' Argument*

Defendants have attacked the entire complaint under Federal Rule of Civil Pro-

cedure 8 which sets forth general rules of pleading and which requires the heart of an affirmative federal pleading to consist of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Plaintiff's claim must be stated with brevity, conciseness and clarity. 5 Wright and Miller, *Federal Practice and Procedure: Civil* 2d § 1215 at 136 (1990). The rule has been construed by the Supreme Court to require only a "short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957). In other words, the pleader must set forth "the prima facie elements of the claim in such a manner as to fairly apprise the adverse party of action against him." *Waterfront Guard Association v. Amstar Corp.*, 363 F.Supp. 1026, 1030 (D.Md.1973), *aff'd*, 508 F.2d 839 (4th Cir.1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975).

█ The general test for adequacy of the pleadings under Rule 8 is "whether the statement of the claim contains the required elements, stated plainly and succinctly, and whether it gives the opposing party fair notice of the nature and basis of the claim." *National Constructors v. National Electric Contractors*, 498 F.Supp. 510, 528 (1980). *See also* 2A *Moore's Federal Practice* Para. 8.17[1] (2d ed. 1991). In each case, what constitutes a short and plain statement must be determined based on the nature of the action, the type of relief sought, and the respective positions of the parties in terms of the availability of information. 5 Wright and Miller, *Federal Practice and Procedure: Civil* 2d § 1217, at 166. In the context of

"a multiparty, multiclaim complaint, each claim should be stated as succinctly and plainly as possible even though the entire pleading may prove long and complicated by virtue of the parties and claims."

*Id.* at 169.

█ Mylan's entire pleading is certainly long and complicated, but this complexity is largely due to the inclusion of nineteen defendants and forty-one claims. Defendants have been put on sufficient notice of the claims and grounds upon which they rest for this Court to deny defendants' rule 8 motions and proceed to the substance of the dispute.

## V. ANTITRUST ISSUES
### (Counts 4 through 40)

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal [ ...]."

Sherman Act, § 1; 15 U.S.C. § 1.

### A. *Mylan's Allegations*

Count 4 of Mylan's First Amended Complaint is Mylan's global antitrust conspiracy count. Mylan incorporates and realleges the first 127 paragraphs of its complaint, then goes on to allege that all of the 19 named defendants

"have been and are now engaged in an unlawful combination and conspiracy to restrain interstate trade and commerce in the development, sale, and distribution in the United States of numerous prescription drugs[.]"

Complaint para. 129. Mylan further alleges that this unlawful combination and conspiracy

"eliminated Mylan as a competitor or substantially restrained competition in the development of and approval for each above-mentioned prescription drug and, accordingly, restrained Mylan's ability to compete in the interstate sale and distribution of the same prescription drugs in violation of section 1 of the Sherman Act."

Complaint para. 130. Mylan alleges a "continuing agreement and concerted action" to accelerate and facilitate FDA approval of the manufacturer defendants' ANDAs while delaying, impeding, and preventing FDA approval of Mylan's competing ANDAs. Complaint para. 131. As

stated previously, this disparate treatment was apparently accomplished through improper and illegal encouragement, inducements, and bribes given to the FDA defendants by the manufacturer defendants and accepted by the FDA defendants. Complaint para. 132.

The results of this unlawful combination and conspiracy, as alleged by Mylan, include (1) adverse affects on competition for the development of and approval for the listed drugs, (2) restrained competition in the sale and distribution of the drugs, (3) the corporate defendants' acquisition and maintenance "by means not honestly industrial" of substantial sales over an extended period, (4) the corporate defendants' collection of "ill-gotten profits," (5) the increased costs of FDA review and approval for Mylan, (6) the substantial restriction and restraint of Mylan's ability to attract and maintain customers, and, finally, (7) excessive prices paid by consumers for prescription drugs. Complaint para. 133.

Mylan requests at least Two Hundred Million Dollars ($200,000,000) in actual damages as well as all costs and fees expended in connection with this matter. Complaint para. 134.

The allegations in counts 5 through 40 are much the same as those described above. Only the constituents of the various conspiracies alleged differ from count to count, according to defendants and drugs named.

### B. Defendants' Attack

Together, defendants have raised a variety of challenges to Mylan's antitrust claims. Some are factual, others legal. For instance, defendant Viterine is not alleged to have competed with Mylan for

approval of generic drugs but to have won FDA approval for a generic version of Mylan's innovator drug "Maxzide." Viterine questions, with reason, how the breaking of a patent monopoly can be considered an antitrust violation. Defendant Quantum asserts that in the instances where it and Mylan were competing for FDA approval of generics, Mylan received approval before Quantum.[4]

■ Defendants' legal challenges are numerous. Several are based on the preliminary assertion, with which this Court agrees, that the actions alleged by Mylan are not *per se* violations of the Sherman Act but are instead governed by the Rule of Reason. Mylan does not argue that it has alleged any recognized *per se* violation[5]; instead, Mylan argues that *per se* application is appropriate because of the unique conditions of generic drug markets and because the defendants' actions undermined the Congressionally mandated system of regulated competition. This argument is without merit. It is true that Congress has seen fit to limit competition in the generic drug market and that defendants' actions harmed this scheme of regulated competition, but Congress's concerns with patent exclusivity and supra-competitive profits on innovator drugs to encourage research and development (as described by Mylan) are irrelevant to the Sherman Act's purpose of enforcing competition. Mylan has advanced no proper reason why it should be entitled to rely on the *per se* rule and not required to demonstrate that defendants' actions harmed competition.

■ Defendants have argued that Mylan has not sufficiently alleged a relevant market,[6] conspiracy,[7] restraint on competi-

---

4. Quantum produced FDA records which indicated the order of approval. Mylan does not argue that this Court may not take notice of the official public records of the FDA; however, Mylan urges the Court not to rely on these records in deciding this preliminary motion as the records alone do not tell the complete story and Mylan should have the opportunity to develop its facts through discovery. The Court does not need to rely on the records produced by Quantum given its disposition of Mylan's antitrust claims below.

5. Courts have recognized price fixing, bid rigging, horizontal market division, (certain) tying arrangements, and (certain) boycotts as *per se* violations of the Sherman Act.

6. In response to defendants' motion, Mylan states that the relevant geographic market is the United States and that the relevant product market is whatever drug is named in the specific count. Mylan's global antitrust count relates to all of the drugs allegedly produced in competition with Mylan's and the 36 restricted antitrust

7. See note 7 on page 1062.

tion,[8] or antitrust injury.[9] Defendants have also argued that their activities do not come within the scope of the antitrust laws and that Mylan's claims must be dismissed on this ground.[10] All of defendants' arguments are compelling, and any one would be sufficient to dispose of Mylan's antitrust claims. *See* notes 8 and 9. However, two

counts relate to various specific drugs, in some instances, dosages. Defendants continue to argue that Mylan's product market designation is insufficient because it does not state where and how competition occurred: in drug development, approval, or marketing.

**7.** *See infra* Part V(D), re Implausible Conspiracy.

**8.** Defendants argue that the actions of which Mylan complains may give rise to an unfair competition claim, but that unfair competition is still competition as required by the Sherman Act. *See Merkle Press, Inc. v. Merkle*, 519 F.Supp. 50 (D.Md.1981) (Courts must be circumspect in converting ordinary business torts into antitrust violations); *Seaboard Supply Co. v. Congoleum Corp.*, 770 F.2d 367 (3d Cir.1985) (Commercial bribery not within scope of antitrust laws). Defendants argue that the accelerated approvals merely increased the options offered the consumer whether the drug was the first generic on the market (thus providing a lower cost alternative to an innovator) or a later entrant (providing more generic alternatives).

Mylan itself characterized competition in the generic drug industry as intense. Mylan alleges that the first generic approved by the FDA wins a disproportionate share of the market. This phenomenon is inherent in the regulatory structure mandated by Congress, however, and is not itself grounds for an antitrust suit. *See U.S. v. Rock Royal Co-op.*, 307 U.S. 533, 560, 59 S.Ct. 993, 1006–07, 83 L.Ed. 1446 (1939), *discussed infra* note 11. As alleged, defendants' actions did not change the nature of competition in the generic drug industry, they only affected the composition of the class of competitors. Thus, there is no anticompetitive effect compensable by the antitrust laws. *See infra* note 9.

**9.** Defendants argue that Mylan was not injured by a *lack* of competition in the generic drug industry but by an overabundance of it. This distinction is critical to Mylan's right to bring an antitrust suit: to bring a private suit under the Sherman Act, the plaintiff must have suffered an "antitrust injury," that is, an injury resulting from the restraint on and reduction of competition. *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977) The law requires more than an injury "causally linked to an illegal presence in the market." *Id.* Instead,

"Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive

effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* This rule stems from the Court's recognition that the antitrust laws exist to prevent a lessening of competition, not to protect individual competitors from the effects of competition, *id.* at 488, 97 S.Ct. at 697, and has been reaffirmed by the Supreme Court in *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 488–89, 93 L.Ed.2d 427 (1986), and most recently in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), a case in which the Court required a showing of antitrust injury even in cases involving *per se* violations of the antitrust laws. 110 S.Ct. at 1893–5.

"Conduct in violation of the antitrust laws may have three effects, often interwoven: in some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition. The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from an [sic] competition-*reducing* aspect or effect of the defendant's behavior. The need for this showing is at least as great under the *per se* rule as under the rule of reason." *Id.* at 1894.

In this case, the injury of which Mylan complains basically resulted from the uncompetitive aspects of the regulatory system mandated by Congress rather than any uncompetitive actions by defendants. Although defendants are alleged to have abused this system, their taking advantage does not necessarily lead to the conclusion that Mylan suffered an antitrust injury.

Obviously, the analysis under this head is somewhat duplicative of the analysis on the restraint of competition issue. *Supra* note 8. Having held that Mylan has not sufficiently alleged an anticompetitive effect, this Court cannot now hold that Mylan has suffered an antitrust injury.

"Tortious activities in the form, for example, of unfair competition, do not contravene the antitrust laws unless accompanied by the requisite anticompetitive effect. Losing business to a competitor is an inevitable consequence of the economic system that the Sherman Act was designed to protect; some enterprises will prevail and others will not, but it is the function of section 1 to compensate the unfortunate only when their demise is accompanied by a generalized injury to the market." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.1984), *cert. den.* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

**10.** *See infra* Part V(C), re *Noerr–Pennington* Immunity.

issues in particular merit detailed consideration: defendants' asserted *Noerr–Pennington* immunity from antitrust scrutiny and the presence or lack of a plausibly alleged conspiracy.

### C. *Noerr–Pennington Analysis*

■ In two cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (1965), the Supreme Court established and applied the rule that "the federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Advertising*, —— U.S. ——, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). This rule sprang from the Court's understanding of the government's need to receive information and input from those it governs. *Noerr*, 365 U.S. at 137, 81 S.Ct. at 529. The rule "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Pennington*, 381 U.S. at 670, 85 S.Ct. at 1593. As the Court said in *Noerr:*

> "Insofar as [the Sherman] Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical."

365 U.S. at 140–1, 81 S.Ct. at 531.

■ Defendants have argued that as they were petitioning the FDA for approval of their ANDAs, their conduct came within the Noerr–Pennington doctrine and was therefore immune from the operation of the Sherman Act.[11] Plaintiff argues in turn that an exception to Noerr–Pennington immunity applies when the petition is merely a "sham" or cover for an attempt to interfere with the business relations of a competitor (i.e. Mylan), and that defendants' actions were unethical and illegal and therefore a sham.

Plaintiff's argument has been foreclosed by the Supreme Court's April 1, 1991 opinion in *City of Columbia v. Omni Outdoor Advertising*, cited above. The facts of that case were not dissimilar from those presented here, and plaintiff's attempts to distinguish *Omni* are therefore unavailing.

Plaintiff Omni alleged that its competitor Columbia Outdoor Advertising (COA), provided free billboard space and other campaign contributions to City Council members in return for regulations which favored COA and thereby protected COA's monopoly position in Columbia's billboard market. 111 S.Ct. at 1347–8. Omni sued the City and COA for violation of §§ 1 and 2 of the Sherman Act as well as South

---

**11.** Noerr–Pennington immunity does apply to attempts to influence agency action even where individualized decision-making (versus regulation of broader application) is involved, unless the attempts come within the "sham" exception, as Mylan argues here. *See California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (Plaintiffs alleged conspiracy "to institute state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those rights." 404 U.S. at 509, 92 S.Ct. at 611. Court held that attempts to influence administrative agencies "creatures of the legislature, and arms of the executive," *id.* at 510, 92 S.Ct. at 612, were protected by Noerr–Pennington unless the attempts were "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 511, 92 S.Ct. at 612 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533). This may be demonstrated by a pattern of baseless, repetitive claims by the conspirators which effectively bar respondents from access to the agencies. *Id.* 404 U.S. at 513, 92 S.Ct. at 613.)

Carolina's Unfair Trade Practices Act, S.C.Code § 39–5–140 (1976). The issue before the Supreme Court was whether the defendants' conduct came within the scope of the antitrust laws. The Court held that it did not.

In discussing Noerr–Pennington immunity, the Court reiterated the rule that private attempts to win anticompetitive action from the government are not regulated by the antitrust laws. 111 S.Ct. at 1354. The Court then examined in detail the "sham" exception to this rule.

> "The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who genuinely seeks to achieve his governmental result, but does so *through improper means.*'"

*Id.* (emphasis in original; citations omitted).

In *Omni* the Court distinguished and limited *California Motor Transport, see supra* note 10, saying that denying a competitor meaningful access to a governmental forum "may render the manner of lobbying improper or even unlawful, but does not necessarily render it a 'sham.'" *Id.* at 1354–5. In *California Motor Transport* the defendants' participation in the process itself was alleged to be a sham "employed as a means of imposing cost and delay," *id.* at 1355 (citing 404 U.S. at 512, 92 S.Ct. at 612–13), and the holding of that case was limited in *Omni* to that factual situation. *Id.*

> "In the present case, of course, any denial to Omni of 'meaningful access to the appropriate city administrative and legislative fora' was achieved by COA in the course of an attempt to influence governmental action that, far from being a 'sham,' was if anything more in earnest than it should have been. If the denial was wrongful there may be other remedies, but as for the Sherman Act, the *Noerr* exemption applies."

*Id.*

The language of the Supreme Court in *Omni* easily applies to the case at bar. The manufacturer defendants are alleged to have denied Mylan meaningful access to the FDA approval process by means of improper inducements paid to the various FDA defendants. The manufacturer defendants, however, perverted the petitioning process in order to obtain the governmental action. Defendants were not interested in the petitioning process itself as an anticompetitive weapon, but in the anticompetitive outcome of that process: first approval of each manufacturer's ANDAs. Delay of Mylan's ANDAs would be useless in itself were not the manufacturer defendants receiving approval of their own ANDAs: as previously stated, no drug can be marketed (hence no market share obtained) without FDA approval. The Supreme Court said in *Omni:*

> "Although COA indisputably set out to disrupt Omni's business relationships, it sought to do so not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate *product* of that lobbying and consideration, viz., the zoning ordinances."

111 S.Ct. at 1355. The Supreme Court's language and reasoning require that this Court dismiss Mylan's antitrust claims against all defendants.[12]

---

12. Mylan has argued that the *Omni* decision does not shield the FDA defendants from antitrust liability: as governmental actors, they are not entitled to *Noerr* immunity; and as federal governmental actors, they are not entitled to the state action immunity established in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See* Mylan's Post-hearing letter to the Court at 1–2.

State action immunity was established in *Parker* in recognition of the "role of sovereign States in a federal system." *Omni,* 111 S.Ct. at 1349.

"The rationale of *Parker* was that, in light of our national commitment to federalism, the

## D. *Implausible Conspiracy* [13]

"A conspiracy is a combination of two or more persons acting in concert to accomplish a common unlawful purpose. A co-conspirator need not know the identity of all other conspirators or the full extent of the conspiracy. But there must be a common agreement and understanding."

general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators."
*Id.* at 1351; *see Parker,* 317 U.S. at 351, 352, 63 S.Ct. at 314. As Mylan says, state action immunity has never been used to shield the actions of the federal government: as supreme sovereign within our federal system, the United States has no need to borrow the sovereign immunity of its constituent states. *See U.S. v. Rock Royal Co-op.,* 307 U.S. 533, 560, 59 S.Ct. 993, 1006–07, 83 L.Ed. 1446 (1939) ("If the [Agricultural Marketing Agreement Act of 1937] and the [Secretary of Agriculture's Order No. 27, issued thereunder] are otherwise valid, the fact that their effect would be to give cooperatives a monopoly of the market would not violate the Sherman Act[.]"); *U.S. v. Cooper Corp.,* 312 U.S. 600, 604, 61 S.Ct. 742, 743, 85 L.Ed. 1071 (1941) (The United States held not to be a "person" as the term was used in the Sherman Act; hence, could neither bring suit or be sued. "Since, in common usage, the term 'person' does not include the sovereign, statutes employing the phrase are ordinarily construed to exclude it."); *Rex Systems, Inc. v. Holiday,* 814 F.2d 994, 997 (4th Cir.1987) (Though Congress reacted to the *Cooper* decision by amending the anti-trust laws to permit the United States to bring suit, "the rationale of *Cooper* relating to the federal government's role as an anti-trust defendant remains unaffected. [ ... ] Since defendants Holiday and Lehman were sued in their official capacities, this reasoning applies to them also. Therefore, we hold that all the federal defendants are not 'persons' under the Sherman Act and so subject to suit against them."); *Strickland v. Flue–Cured Tobacco Co-op.,* 643 F.Supp. 310, 321 (D.S.C.1986) ("It is well-settled, however, that the federal government and its agencies are immune from antitrust liability. [ ... ] In addition, private parties with whom the Government and its agencies deal are not subject to the antitrust laws." (citations omitted)).
Though the FDA employees named as defendants are alleged to have acted in an improper and unauthorized manner, this does not affect their entitlement to immunity. *See Omni,* 111 S.Ct. at 1349 (discussing municipality's authority to regulate: "It could be argued, however, that a municipality acts beyond its delegated authority, for *Parker* purposes, whenever the

*In re Insurance Antitrust Litigation,* 723 F.Supp. 464, 483 (N.D. Cal.1989) [14] (citing *U.S. v. Metropolitan Enterprises, Inc.,* 728 F.2d 444, 450–1 (10th Cir.1984)); *see also United States v. Norris,* 749 F.2d 1116, 1121 (4th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985).

Defendants attack Mylan's global conspiracy counts on two related grounds. [15] First, they argue that Mylan

nature of its regulation is substantively or even procedurally defective. [ ... ] [S]uch an expansive interpretation of the *Parker*-defense authorization requirement would have unacceptable consequences."); *Rex Systems,* 814 F.2d at 995–6 (Government defendants alleged to have violated their own procurement laws held not subject to the antitrust laws).

**13.** Despite this Court's conclusion that the *Noerr–Pennington* analysis requires dismissal of Mylan's antitrust claims, the conspiracy issue shall also be examined. Not only does it implicate the viability of Mylan's antitrust claims, but it is also critical to the survival of Mylan's § 1962(d) RICO conspiracy claim. *See infra* Part VI.

**14.** On June 18, 1991 the Ninth Circuit reversed the District Court's dismissal of this case and remanded it for further proceedings. The Court did not address the District Court's conspiracy analysis. 1991 U.S.App. Lexis 12,336.

**15.** Defendants have also attacked Mylan's individual antitrust conspiracy counts. In each of these counts, 5 through 40, Mylan alleges a conspiracy between the corporate manufacturer, the individual agents, and the FDA defendants. It is established that a corporation is legally incapable of conspiring with its subsidiary in violation of § 1 of the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741–42, 81 L.Ed.2d 628 (1984); *Advanced Health–Care Services v. Radford Community Hospital,* 910 F.2d 139, 146 (4th Cir.1990) (Following *Copperweld,* the Fourth Circuit concludes "that two subsidiaries wholly owned by the same parent corporation are legally incapable of conspiring with one another for purposes of § 1 of the Sherman Act."). Similarly, a corporation cannot conspire with its agents. *Marmott v. Maryland Lumber Co.,* 807 F.2d 1180, 1184 (4th Cir.1986), *cert. den.* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987). Thus, only the alleged agreements between the individual manufacturer defendants and the specific FDA defendants with whom they were dealing is of any relevance to Mylan's individual antitrust conspiracy counts. The corporate defendants argue that there were no cognizable conspiracies between them and the FDA defendants as the FDA defendants were mere

has alleged no facts which support the conclusory allegation of a conspiracy between the corporations; second, they argue that the conspiracy is illogical as alleged. Mylan state that its allegations of each corporation's tie to the FDA "hub" is a sufficient allegation of the existence of a conspiracy between the corporations. Furthermore, Mylan asserts that the alleged conspiracy does in fact make economic sense.

■ In its complaint, Mylan has alleged facts sufficient to support the conclusion that there were various agreements between the manufacturer defendants and the FDA defendants, i.e., that the former were paying the latter in return for first approval of the ANDAs.[16] Mylan's assumption that these factual allegations are sufficient to support the conclusory allegation of global conspiracy is based on the faulty premise that it is not necessary to demonstrate agreement between the corporate defendants in holding them to the alleged conspiracy. Mylan asserts in its first Memorandum in Opposition to defendants' motions that "an antitrust conspiracy may consist of a hub and spokes without a rim." Opp. at 47. This is an incorrect statement of the law.

"Mere identity of purpose, interconnected events and shared participants, on which plaintiffs base their claim, do not link separate conspiracies into one overall, single conspiracy. For separate activities to result in a single conspiracy, the allegations and proof must reflect a wheel and spoke arrangement in which a single person at the hub implements the conspiracy by a series of arrangements with others to carry out the purpose of their conspiracy. *But such separate activities, even if for a common purpose, do not constitute a conspiracy 'without the rim of the wheel to enclose the spokes.' There must be a connection among all of the alleged participants sufficient to support a finding that they had entered into the alleged conspiracy.*"

*In re Insurance Antitrust Litigation,* 723 F.Supp. at 483–4 (emphasis added) (quoting *Kotteakos v. United States,* 328 U.S. 750, 754, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946)).

The cases cited by Mylan do not say otherwise. The essence of concerted activity is agreement, whether explicit or implicit. *See In re Mid–Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760 (D.Md. 1983).[17] Mylan need not show that each alleged conspirator had knowledge of all of the details of the conspiracy, *United States v. Tillett,* 763 F.2d 628, 632 (4th Cir.1985), but Mylan must show that each alleged conspirator "participated in the conspiracy with knowledge of the essential nature of

---

"pawns" rather than co-conspirators. *See In re Mid–Atlantic Toyota Antitrust Litigation,* 560 F.Supp. 760, 777 (D.Md.1983) (re defendants as mere pawns of the conspiracy rather than co-conspirators); *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1072–6 (3d Cir.1978) ("Pawn" defined in terms of knowledge of the anticompetitive intent and scheme). For the purposes of discussion of the global conspiracy issues, the Court is willing to assume that such individual conspiracies have been alleged. *See infra* note 16. This does not affect the dismissal of counts 5 through 40, however, which is proper for the other reasons discussed above.

**16.** *See supra* note 15. Certain manufacturer defendants assert that the allegations of gratuities paid do not support the inference of an agreement with the FDA defendants because the manufacturer defendants did not, in fact, receive any prompter approval than would have been granted absent the gratuity. They have produced FDA records to demonstrate that the order of approval was in line with the order of submission of the ANDA. For the purposes of the motions to dismiss, however, the Court shall accept Mylan's allegations of quid pro quo as true notwithstanding the records produced by defendants.

**17.** Mylan cites this case as authority for the proposition that rimless conspiracy is recognized in antitrust law. The case does not so hold. In fact, the court analyzes in detail the allegations and evidence regarding the existence of agreement between the dealers, i.e. the rim, before considering whether the organizer of this horizontal conspiracy can also be held as a co-conspirator. The court first notes that "consciously parallel business behavior without more does not entitle plaintiff to directed verdict in his favor," 560 F.Supp. at 772, and then goes on to consider the various "plus factors", such as evidence of dealer meetings, which permit the inference of conspiracy. 560 F.Supp. at 772–5.

the plan." *Id.* [18] *See also United States v. Rastelli,* 870 F.2d 822 (2nd Cir.1989); *United States v. Griffin,* 660 F.2d 996 (4th Cir.1981), *cert. den.* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982).[19] The issue, therefore, is whether Mylan has alleged facts which, if proved at trial, would be sufficient to permit the inference of agreement between the corporate defendants, the rim of the conspiracy.

In *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court explored the limits of permissible inferences which could be drawn from circumstantial evidence of conspiracy. *Monsanto* involved a plaintiff-distributor allegedly terminated by the manufacturer pursuant to an agreement to maintain prices between the manufacturer and other distributors. The Court noted that § 1 of the Sherman Act requires evidence of concerted action and that "[i]ndependent action is not proscribed." 465 U.S. at 761, 104 S.Ct. at 1469. The Court went on to hold that

> "There must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently. [T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' "

465 U.S. at 764, 104 S.Ct. at 1471 (citations omitted).

In *Matsushita,* the Supreme Court applied the rule stated above in the context of summary judgment.[20] The Court said that

> "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. [ ... ] To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. [*Monsanto,*] 465 U.S. at 764 [104 S.Ct. at 1471]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents."

475 U.S. at 588, 106 S.Ct. at 1356. Plaintiffs in *Matsushita* had alleged a long-term agreement between Japanese manufacturers of electronic products to artificially inflate prices in Japan in order to artificially lower prices in the United States thus driving American producers of consumer electronic products out of the American market. The Court held that evidence of a conspiracy to raise prices in Japan was irrelevant to show the existence of a conspiracy to lower prices in the United States, 475 U.S. at 596, 106 S.Ct. at 1361, and described the other evidence of conspiracy in the United States as speculative and ambiguous because of the economically senseless nature of the alleged conspiracy. *See* 475 U.S. at 595, 597–98, 106 S.Ct. at 1361–62.

> "Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if peti-

---

**18.** Defendants in *Tillett* were both convicted of conspiracy to import marijuana in violation of RICO and both argued that the evidence was insufficient to support the conviction. The Fourth Circuit considered the issue whether one or two conspiracies had been established by the evidence and held that the jury reasonably concluded that by agreeing to captain boats for the central figure Holland on two separate occasions and by participating in the off-load of drugs, defendants understood that they were participating in an ongoing business. 763 F.2d at 632–3.

**19.** *Rastelli* and *Griffin* are cases dealing with a RICO associated-in-fact enterprise. *See infra* Part V. Both cases, however, support the distinction between agreement as to the essential elements of the conspiracy (necessary) and knowledge of the details of the conspiracy (not necessary).

**20.** *Monsanto* was tried to a jury which had found that the termination of the plaintiff-distributor was pursuant to a conspiracy between Monsanto and one or more of its distributors to set resale prices. 465 U.S. at 757–8, 104 S.Ct. at 1467–8.

tioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."

475 U.S. at 597, 106 S.Ct. at 1361.[21]

■ Defendants argue that the global antitrust conspiracy alleged by Mylan is counter-intuitive and makes no economic sense in the intensely competitive market described by Mylan in its complaint: defendants would not conspire to give someone else first approval if first approval is so critical to market success. In its opposition, Mylan posits that the defendants conspired to allocate first approvals among themselves. This allegation appears nowhere in the complaint, however, and "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984). The Court, therefore, restricts its consideration to allegations which do appear in the complaint.

■ This Court agrees that, as alleged, defendants' actions are at least as likely to have been the product of self-interested competition as anti-competitive conspiracy.[22] Moreover, Mylan has alleged nothing tending to exclude the possibility that the defendants acted independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1470–71; *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356–57. Although in antitrust cases "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Advanced Health–Care Services v. Radford Community Hospital*, 910 F.2d 139, 144 (4th Cir. 1990) (quoting *Hospital Building Co. v. Trustees of Rex Hospitals*, 425 U.S. 738, 747, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976)), they are not precluded. *Car Carriers, Inc.*, 745 F.2d at 1109–10 (dismissing

§ 1 Sherman Act claim alleging an "inherently implausible" conspiracy. "In considering a motion to dismiss, the court is not required to don blinders and ignore commercial reality."); *In re Insurance Antitrust Litigation*, 723 F.Supp. at 484 ("Plaintiffs have made no attempt to show the existence of such a connection to support a finding of a single overall conspiracy, and the allegations of the complaint would not permit proof of one."). For these reasons, Mylan's conclusory allegations of a global conspiracy between all the defendants cannot stand.

## VI. RICO ISSUES (Counts 1 through 3)

"It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity [ ...], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce [ ...].

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity [ ...].

"It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d).

### A. *Mylan's Allegations*

Counts 1 through 3 of Mylan's complaint allege violations of RICO, 18 U.S.C.

---

**21.** The Court remanded the case to the Court of Appeals to determine whether there was other evidence "sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so." 475 U.S. at 597, 106 S.Ct. at 1362.

**22.** Mylan argues that the fact that the manufacturer defendants all dealt with the same FDA officials permits the inference of concerted action. Mylan has alleged, however, that ANDA approval responsibility was concentrated in these few people; thus the coincidence alleged does not lead to the inference argued.

§ 1962(a), (c) and (d). Count 1 is Mylan's 1962(c) claim; count 2 is Mylan's 1962(a) claim; and count 3 is Mylan's 1962(d) claim. This last count, in which a global conspiracy to violate RICO is alleged, should—and will—be dismissed for the reasons discussed above in Part V(D). The other two counts require further consideration.

As is clear from the language of the statute itself, to hold any or all defendants liable for RICO, there must be both an "enterprise" and a "pattern of racketeering activity". As these requirements underlie both § 1962(c) and § 1962(a), they will be discussed first and the issues pertinent only to § 1962(a) liability will be discussed after, if necessary.

In paragraphs 99, 100 and 101 of the complaint, Mylan alleges three alternative enterprises. The first is an associated-in-fact enterprise comprised of all defendants, corporate and individual. The second is the FDA itself. The third is comprised of all individual defendants; presumably Mylan intends this to be an associated-in-fact enterprise as well, although this is not explicitly stated.

In paragraph 103, Mylan outlines 37 pages of predicate acts committed by all defendants which are alleged to form a pattern. These acts break down roughly into three groups: bribery, mail and wire fraud, and obstruction of justice.

Following these factual allegations, Mylan then asserts that defendants by their actions have violated the relevant provisions of RICO and requests exemplary damages, costs and fees, and actual damages of at least two hundred million dollars.

### B. *Defendants' Arguments*

Because of the complexity of the factual allegations and legal issues involved, it is not feasible to list every defendant's arguments at once. Instead, the issues relating to specific defendants will be noted in the discussion below.

---

**23.** *See infra* note 43.

### C. *Pattern of Racketeering Activity*

"[A] 'pattern of racketeering activity' requires at least two acts of racketeering activity [ . . . ]"

18 U.S.C. § 1961(5).

#### 1. Predicate Acts Alleged

##### a. *Bribery*

Bribery is an offense specifically included in the list of acts constituting racketeering activity. 18 U.S.C. § 1961(1). In paragraph 103 of its complaint, Mylan alleges numerous incidents of bribery by ATI through its agents Vegesna and Azeem to the FDA defendants Change, Brancato, Sturm and Kletch. Par and Quad, through Patel and Shah, are alleged to have bribed Chang, Brancato and Kletch with money, meals, and gift certificates to Lord & Taylor and Raleighs. Matkari, the agent of PBI, Akzo's subsidiary, is alleged to have paid Chang money and to have lunched with him. PBI's corporate predecessor, My–K, through its agent Bae, is alleged to have had more extensive contact with Chang, providing him with money, bonds and a pleasant vacation at Bae's country home.[23] AHP/Quantum/J. Chang is alleged to have made a single payment of $300 to Brancato. Viterine is not alleged to have made any bribes.

A number of the corporate defendants have questioned whether they can be held liable for the acts of their agents. They assert that *respondeat superior* is an inappropriate basis for liability under RICO, cite cases in apparent support of this proposition, and ask this Court to overrule its 1985 decision in *Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985). The Court declines to do so.

*Morley* held that the doctrines of vicarious liability and *respondeat superior* were applicable in RICO cases. 610 F.Supp. at 811.

"Thus, a corporation or partnership can be held liable under RICO for the acts of its agents and/or representatives committed within the scope of their authority."

*Id.* The reasoning of more recent decisions by several Courts of Appeals suggest that this holding should not be broadly applied in all cases, but do not undermine its applicability to the case at hand.

In *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986), the First Circuit held that a corporation which had been named as the relevant RICO enterprise could not be held liable for civil damages under § 1962(c) either directly or under principles of *respondeat superior*. 793 F.2d at 30–33. The Court's holding was grounded in § 1962(c)'s requirement "that the 'person' who engages in the pattern of racketeering activity be an entity distinct from the 'enterprise'." *Id.* at 29 (citing *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir. 1982)).[24] In *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964 (7th Cir.1988), *cert. den.* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), the Seventh Circuit followed *Schofield* and held that the defendant corporation could not be held vicariously liable for the acts of its employee who had been stealing auto parts, selling them for his own benefit, and then billing plaintiff to cover the loss. 838 F.2d at 966–7. The Court described the defendant corporation as the "victim" rather than the perpetrator, 838 F.2d at 967, and said

> "vicarious liability is inconsistent with this court's approach to direct RICO liability [ ...] The statute, as interpreted by this court, imposes liability only upon a corporation that is a perpetrator of a criminal scheme."

*Id.* at 966.[25]

Neither of these holdings applies to the case at bar. As the District Court for the District of Connecticut aptly observed

**24.** This distinction is not required by § 1962(a). *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir.1990).

**25.** The Court also questioned whether the employee's acts could truly have been said to have been within the scope of his employment. "An employee violating RICO without his employer's knowledge is highly unlikely to be acting for his employer's benefit." 838 F.2d at 967.

> "A number of courts have addressed the question of vicarious liability under RICO, but many of these cases are of limited precedential value here. In these cases, the resolution of the issue of vicarious liability was intimately bound up with the holding that, as a matter of statutory interpretation under RICO, a corporation may not be named as both a defendant 'party' and as the RICO 'enterprise.'"

*Gruber v. Prudential–Bache Securities, Inc.*, 679 F.Supp. 165, 179 (D.Conn.1987). The Court also noted that, in contrast to the traditional common law doctrine of *respondeat superior*,

> "Some courts have recognized [ ...] a difference between 'aggressor' and 'conduit' corporations for the distinct purposes of the RICO statute, and have thus declined to subject the latter to vicarious liability."

679 F.Supp. at 180.

In this case, the corporations are individually named as parties not as the enterprise. Furthermore, the corporations are not alleged to have been the victim or unwitting conduit of racketeering activity. The concerns of those courts which have declined to apply *respondeat superior* thus do not apply, and this Court will adhere to its holding in *Morley* that *respondeat superior* is applicable. 610 F.Supp. at 811. *See also Gruber*, 679 F.Supp. at 181 (Corporation may be found vicariously liable where it is the central figure or aggressor in the alleged scheme); *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 n. 5 (4th Cir.1990) (quoting *D & S*, 838 F.2d at 967: "The formulation of the statute is designed to impose liability upon a corporation which is a perpetrator of illegal activity but not upon an unwitting conduit of its employees' RICO violations.").[26]

**26.** Mylan may not be able to prove that the acts of the various corporate employees were not isolated unauthorized sprees, as the corporate defendants contend that they were. For the purposes of this 12(b) motion, however, the Court will assume that "an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity." *Gruber*, 679 F.Supp. at 181. The Court does recognize, however, that the doctrine of *respondeat superior* may be more limited in RICO cases than in

### b. Mail and Wire Fraud

#### i. Introduction

Mail and wire fraud are also specifically included in the list of acts constituting racketeering activity. 18 U.S.C. § 1961(1). In paragraph 103 of its complaint, Mylan alleges that the manufacturer defendants mailed to the FDA defendants numerous falsified ANDAs and that the FDA defendants, in turn, mailed to the manufacturer defendants approval of the various ANDAs. Mylan suggests first that the FDA was defrauded out of its ANDA approvals by the false submissions of the defendants to the FDA and second that it, Mylan, was defrauded out of its rightful ANDA approval and proper market share by the false submissions of the defendants to the FDA.

Mylan also alleges that, in conjunction with improperly facilitating the approval of defendants' ANDAs, the FDA defendants

"mailed or caused to be mailed deficiency letters to Mylan alleging that Mylan's pending ANDAs and/or supplemental ANDAs were deficient and/or requesting unwarranted and unjustifiable data and/or requesting information allegedly for review purposes; however, the purpose was to delay the processing of ANDAs submitted by Mylan while Defendants Chang, Brancato, and Kletch expedited the review of the ANDAs of the same generic drug submitted by the corporate defendants."

And,

"On information and belief, Defendants Chang, Brancato, Kletch, and Sturm mailed or caused to be mailed to the corporate defendants, officers, agents, and/or their co-conspirators confidential and proprietary materials, that Mylan had submitted to the FDA, in order to assist the scheme of expediting the review and approval of ANDAs submitted by the corporate defendant(s) involving the same generic drugs."

Complaint, para. 103(D)(11) and (12).

Predictably, defendants have attacked the sufficiency of Mylan's mail and wire fraud allegations on a variety of grounds.

#### ii. ANDA Approval As Property

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court reversed a long line of Court of Appeals decisions as well as petitioners' convictions and held that the mail fraud statute did not protect "the intangible right of the citizenry to good government." 483 U.S. at 356, 107 S.Ct. at 2879. Instead, the Court held that the mail fraud statute was limited in its scope to the protection of property rights. *Id.* at 360, 107 S.Ct. at 2881–82.[27]

The following term, the Court refined the *McNally* holding further. *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), involved a scheme to trade on the Wall Street Journal's confidential business information; defendants were convicted of mail and wire fraud, and the Court affirmed.

"The Journal, as [defendant's] employer, was defrauded of much more than it

---

other cases so that the authority cited by Mylan is less compelling than it would appear. *Compare U.S. v. Automated Medical Laboratories, Inc.*, 770 F.2d 399, 406–7 (4th Cir.1985) (Corporation charged with conspiracy to submit false documents to the United States may be held criminally liable for unlawful practices if agents were acting within the scope of their employment: performing acts of the kind authorized to and motivated at least in part by an intent to benefit the corporation; this despite the corporation's protestations that the agents' falsification of the logs was unauthorized and against company rules.); and *D & S Auto Parts*, 838 F.2d at 968 (The rule of *respondeat superior* as applied in antitrust cases is not applicable to RICO which does "indicate Congressional intent

to create an exception to the general rule of *respondeat superior*.").

**27.** On November 18, 1988, Congress added 18 U.S.C. § 1346 to the mail fraud chapter in order to overturn the effect of the *McNally* decision and reinstate the pre–*McNally* law that deprivation of honest services was covered by the mail fraud statute. The acts alleged in the complaint appear to have occurred prior to the effective date of § 1346, and no party has briefed the potential applicability of the section. Accordingly, the Court has restricted its consideration of this issue to the cases discussed below and is of the opinion, having reviewed the cases, that the section does not apply to this case—factually or legally.

contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.' *McNally, supra,* [483 U.S.,] at 359, n. 8 [107 S.Ct. at 2881 n. 8]. Here, the object of the scheme was to take the Journal's confidential business information—the publication schedule and contents of the 'Heard' column—and its intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinct from intangible property rights."

484 U.S. at 25, 108 S.Ct. at 320.

From these decisions came a line of authority, cited by defendants, holding that "an unissued license does not constitute property in the hands of the government for federal fraud statute purposes." *United States v. Schwartz,* 924 F.2d 410, 417 (2nd Cir.1991) (citing *United States v. Kato,* 878 F.2d 267, 268–9 (9th Cir.1989) (pilot license); *Toulabi v. United States,* 875 F.2d 122, 125 (7th Cir.1989) (cabdriver license); *United States v. Murphy,* 836 F.2d 248, 254 (6th Cir.), *cert. denied* 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988) (bingo license); *United States v. Granberry,* 908 F.2d 278, 280 (8th Cir.1990) (school-bus operator permit); and *United States v. Evans,* 844 F.2d 36 (2d Cir.1988) (export license)). *See also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 792–3 (1st Cir.1990), *cert. den.* — U.S. —, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990) (quoting *Corcoran v. American Plan Corp.,* 886 F.2d 16, 20–1

(2d Cir.1989): "mail fraud statute protects only the government's interest as a property-holder, excluding protection of an governmental entity in its capacity as regulator").

Thus, defendants argue that insofar as Mylan's mail and wire fraud counts are based on the theory that the FDA was defrauded out of its ANDA approvals, the counts cannot stand. Mylan quite properly points out that the line of authority referred to by defendants is not unbroken: the Third Circuit has held that fraudulently obtaining a medical license from the state did fall within the purview of the mail fraud statute. *United States v. Martinez,* 905 F.2d 709, 715 (3rd Cir.1990), *cert. den.* — U.S. —, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990). The Third Circuit criticized the "esoteric distinction[s]" inherent in the above-listed opinions and held that the unissued medical license fraudulently obtained by defendant did constitute property in the hands of the government within the meaning of the mail fraud statute.

"[T]he government's interest here is not simply that of a regulator, but rather that of the dispenser of valuable property in which the licensee has constitutionally protected property interests and which the government may enjoin upon misuse."

905 F.2d at 715.

This Court chooses not to follow the Third Circuit's holding in *Martinez*[28] and instead follows the well-reasoned decisions of the First, Second, Sixth, Seventh, Eighth and Ninth Circuits, cited above. FDA approval may well be valuable to the recipient (if Mylan's damage claims are any indication); this does not mean that they are valuable in the same way to the FDA.[29]

---

**28.** In *Martinez* the Third Circuit relied in part on two Eastern District of New York cases, *U.S. v. Turoff,* 701 F.Supp. 981 (E.D.N.Y.1988), and *U.S. v. Berg,* 710 F.Supp. 438 (E.D.N.Y.1989), *aff'd in part; rev'd in part U.S. v. Schwartz,* 924 F.2d 410 (2nd Cir.1991), which are no longer good law given the Second Circuit's most recent pronouncement on the issue. In *U.S. v. Schwartz,* 924 F.2d 410 (2nd Cir.1991), the Second Circuit reversed the District Court's judgment in *Berg* and held that the arms export licenses were not property within the meaning of the fraud statutes.

**29.** *See Medical Inc. v. Angicor Ltd.,* 677 F.Supp. 1000, 1005 (D.Minn.1988) ("[T]he FDA's interest in approving exports is more similar to the intangible right of the citizenry to good government than the intangible property right a business has in its confidential business information. [ ... ] The purpose of the Food, Drug, and Cosmetic Act is to protect the consuming public. [ ... ] The process of obtaining export approval is simply a method used by the FDA to protect the consuming public abroad. While export approval likely has a definite and measurable value to the recipient, there is no indication that the FDA has any financial interest,

Such a distinction may seem esoteric, but such is the law. This Court holds that the FDA cannot have been defrauded of its ANDA approvals within the meaning of the federal mail and wire fraud statutes. Accordingly, to the extent Mylan's allegations of mail and wire fraud rely on this theory, they must be dismissed.

### iii. Identity of Deceived and Defrauded

In *McNally, supra,* the Supreme Court stated

"Insofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property."

483 U.S. at 356, 107 S.Ct. at 2880. Further, the Court said that

"the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or over-reaching.' *Hammerschmidt v. United States,* 265 U.S. 182, 188 [44 S.Ct. 511, 512, 68 L.Ed. 968] (1924)."

*Id.* 483 U.S. at 358, 107 S.Ct. at 2881.

Picking up on this language, the Second Circuit in *United States v. Evans, supra,* noted that the "Supreme Court did not focus on whether the person deceived also had to lose money or property," 844 F.2d at 39, but indicated that this could well be the proper view.

"If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived person must lose some money or property."

*Id.* That is, there must be a convergence of the deceived and the injured.[30]

Although the Second Circuit has not expressly held that the mail fraud statute requires the convergence of the deceived and the injured,[31] both the Ninth and Tenth Circuits have held that

"Under *McNally,* instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was itself defrauded of money or property."

*United States v. Shelton,* 848 F.2d 1485, 1495 (10th Cir.1988) (Jury instructions were inadequate as the definition "includes a plan to acquire money or property *but does not require that this money or property come from the victim.*" 848 F.2d at 1496 (emphasis in original)); *see also United States v. Lew,* 875 F.2d 219, 221 (9th Cir. 1989) ("[T]he intent must be to obtain money or property from the one who is deceived"); *United States v. Keane,* 678 F.Supp. 708, 711 (N.D.Ill.1987), *aff'd* 852 F.2d 199 (7th Cir.1988), *cert. denied* 490 U.S. 1084, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989) ("*McNally* serves to tighten up the concept of 'victim.' That is, to constitute fraud the entity to be deceived must *also* be the entity that is to part with property.)

This holding has not been uniform. Mylan cites a number of mail fraud cases in which the entity deceived was not the entity deprived of property. In *Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969 (S.D.N.Y.1989), the court held that the injured plaintiff, an importer of watches, did not need to show that he relied on the defendant's false statements to United States Customs Officials (in response to which Customs seized plaintiff's watches) in order to bring a RICO action alleging mail and wire fraud as the predicate acts. 726 F.Supp. at 972–3.

"A plaintiff who is injured as a proximate result of fraud should be able to

---

tangible or intangible, in issuing or not issuing export approval. Consequently, the FDA does not have a cognizable property interest under the mail fraud statute in granting export approval").

**30.** *Evans* was not actually decided on this issue. Instead, the Second Circuit ruled on the license-as-property issue discussed above. Similarly, in

*Corcoran, supra,* the court discussed the issue of identity of the deceived and the injured, on which issue the district court had followed the dicta of *Corcoran,* 886 F.2d at 19–20, but held that the government as a regulator was not protected by the mail fraud statute. *Id.* at 21.

**31.** *See supra* note 30.

recover regardless of whether he or a third party is the one deceived."

*Id.* at 973 (citing *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282 (S.D.N.Y. 1988)).[32]

This Court feels that the better rule is to require that the person allegedly deceived by the misrepresentations be the person injured by the misrepresentations. This convergence of identity seems inherent in the idea of fraud as provided in the fraud statutes and defined by the Supreme Court in *McNally.* Moreover, the Fourth Circuit's holding in *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988), suggests that this is the proper course.[33] Accordingly, to the extent Mylan's claim of mail and wire fraud rests on the grounds that it was injured by defendants' false submissions to the FDA, the claim must fail.

### iv. Rule 9(b)

Thus, Mylan's claims and mail and wire fraud, if they are to succeed at all, must be based on the premise that Mylan was the entity deceived and injured. Mylan alleges this in paragraphs 103(D)(11) and (12) and 103(E)(11) of the complaint. *See supra* page 1071. Defendants argue that these allegations have been made in conclusory fashion and must therefore be dismissed under Fed.R.Civ.P. 9(b) which requires that all allegations of fraud be pled with particularity.[34]

Rule 9(b) applies to claims arising under RICO, and a RICO claim alleging fraud as its underlying predicate act must do so with particularity or else be dismissed. *See Wang Laboratories, Inc. v. Burts,* 612 F.Supp. 441 (D.Md.1984). The requirement of "particularity" does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists. *Copiers Typewriters Calculators v. Toshiba Corp.,* 576 F.Supp. 312, 327 (D.Md.1983). Specifically, detail is necessary when pleading the "circumstances" of the fraud. "The rule requires the presentation of the situation out of which the claim arose." *Oliver v. Bostetter,* 426 F.Supp. 1082, 1089 (D.Md.1977).

> " 'Circumstances' refers to such matters as 'the time, place and contents of the false representations, as well as the identity of the person making the misrepresentation, and what [was] obtained thereby' ".

*Windsor Assoc. Inc. v. Greenfeld,* 564 F.Supp. 273, 280 (1983) citing Wright and Miller, *Federal Practice and Procedure,* § 1297, at 590 (1990) (and cases cited therein). Mylan should allege defendants' individual participation in the alleged fraud as well as the relationship of the individual

---

**32.** Interestingly, the court in *Shaw* cited the Fourth Circuit case of *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988) for the proposition that in a suit for mail fraud the intended victim need not show detrimental reliance on the mailed misrepresentations, but refused to follow the *Brandenburg* holding that under RICO, § 1964(c), the private plaintiff must have relied on and been injured by the misrepresentations.

**33.** *See infra* note 32. In *Brandenburg* the Court construed 18 U.S.C. § 1962(c), which provides for a private civil action, as requiring plaintiffs to demonstrate an injury caused by the predicate acts of the defendant. 859 F.2d at 1187. The Court affirmed the district court's dismissal of the RICO counts for lack of such a demonstration.

> "[T]he Amended Complaint contains no specific allegation that the named or class plaintiffs acted in reliance on any misrepresentations directly made by the MSSIC defendants when they decided to deposit their money in First National."

*Id.* at 1188. The Fourth Circuit did note that it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the mail fraud statute, *Id.* n. 10; however, its holding with regard to RICO injury suggests some concern with the convergence issue.

Mylan has produced the Fourth Circuit's slip opinion in *Wolf v. Klein,* 907 F.2d 1141 (4th Cir.1990); however, the part cited as relevant by Mylan has not been published (hence the need for the slip opinion) and the language quoted does not actually address the issue as the Court was concerned with other matters. Accordingly, this Court does not regard *Wolf* as authority for the proposition for which it was cited.

**34.** Federal Rule 9(b): Fraud, Mistake, Condition of the Mind.

> "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."

defendants to the purported scheme. *Wang Laboratories,* 612 F.Supp. at 445.

The particularity requirement of Rule 9(b) does not render the general principles announced in Rule 8 entirely inapplicable in pleadings alleging fraud: both rules must be read in conjunction with each other. *Oliver v. Bostetter,* 426 F.Supp. 1082, 1089 (D.Md.1977); 5 Wright and Miller, *Federal Practice and Procedure: Civil* 2d. § 1298 at 617 (1990). In balancing the policies of rules 8 and 9(b),

> "The most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading."

*Windsor Assoc. Inc.,* 564 F.Supp. at 280; *Nunes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 609 F.Supp. 1055, 1065 (D.Md. 1985); Wright and Miller, *Federal Practice and Procedure,* § 1298 at 648 (1990). Nonetheless, a pleading sufficient under Rule 8 may not be sufficient under Rule 9(b) which "requires more than mere notice in cases of fraud." *Oliver,* 426 F.Supp. at 1089.

■ The allegations contained in paragraphs 103(D)(11) and (12) and 103(E)(11) are inadequate under the standards set forth above. The allegations are phrased over-broadly and specify none of the relevant "circumstances" of the fraud. Nor has Mylan specified the relationship of the manufacturer defendants to the fraud, relying on its earlier conclusory allegations of conspiracy to save these later conclusory allegations of fraud. This will not do. Therefore, this Court strikes these paragraphs under Rule 9(b). As these presented the only possible legal bases for Mylan's mail and wire fraud claims, these claims must be considered insufficient and will be disregarded when determining whether a pattern exists and a proper RICO cause of action has been pled.

### c. *Obstruction of Justice*

■ In paragraph 103(F) of its complaint, Mylan alleges that various defendants "engaged in various activities to obstruct and hinder legitimate investigations of their criminal conduct" in violation of 18 U.S.C. § 1503[35] and § 1512.[36] Specifically, Vegesna is alleged to have falsified ATI records; Par officer R. Patel[37] is alleged to have intentionally given a wrong batch sample to the FDA, i.e. not the actual negative data but some later acceptable data, and to have improperly recorded negative results in a "secret book" rather than the official records; and Colton is alleged to have destroyed records and to have made numerous false entries in the records.

Defendants argue that these activities allegedly occurred in the context of agency and Congressional investigation of the generic drug matter so that the statute actually violated was 18 U.S.C. § 1505: obstruction of federal agencies and Congress. The relevance of this distinction, of course, is that while violation of §§ 1503 and 1512 are both included as racketeering offenses in 18 U.S.C. § 1961(1), violation of § 1505 is not included and is therefore not a proper predicate offense.

Mylan has alleged that Congress and the grand jury were both investigating the matter. Clearly, both investigations would have been hindered by the falsification and destruction of records alleged. The fact that certain actions were taken in response to Congressional subpoena[38] does not render them a nullity in terms of the grand jury investigation. The Fourth Circuit has noted the similarity between § 1503 and § 1505 and has held that both statutes should be broadly construed as both were enacted "to serve comparable goals." *United States v. Mitchell,* 877 F.2d 294, 298–9, 299 n. 4 (4th Cir.1989). Accordingly, this Court will permit Mylan's allegations

---

**35.** Obstruction of justice.

**36.** Tampering with a witness, victim or informant.

**37.** Apparently not defendant Ashok Patel.

**38.** For instance, Vegesna is alleged to have falsified still more ATI records after receiving a Congressional subpoena; R. Patel sent the wrong batch sample in response to an FDA query.

of obstruction of justice to remain an issue in this litigation.

### 2. Relationship and Continuity

A holding that Mylan has sufficiently alleged the predicate acts of bribery and obstruction of justice does not end the inquiry into the sufficiency of Mylan's RICO claims. The next question is whether the acts alleged constitute a sufficient "pattern" of racketeering activity.

 The RICO statute itself requires "at least two" instances of racketeering activity. 18 U.S.C. § 1961(5). In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court held that this was a minimal requirement but not a guarantee of sufficiency. A "pattern" requires a showing of a *relationship* between the predicate acts and a threat of *continuing* activity. 492 U.S. at 239, 109 S.Ct. at 2900–01 (emphasis added).

> Relation is shown by
> "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

492 U.S. at 240, 109 S.Ct. at 2901. Mylan's allegations are clearly sufficient to satisfy the relatedness aspect of the requirement: each defendant's actions were focussed on undermining the integrity of the FDA approval process in order to improperly obtain advantage for themselves.

The continuity aspect of the pattern requirement is the more difficult one to satisfy. The Supreme Court itself has seemed to experience some difficulty in defining "continuity." [39] In *H.J. Inc.*, it held that:

> " 'Continuity' is both a *closed*- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a *threat of repetition*. [ ... ] A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."

492 U.S. at 241–2, 109 S.Ct. at 2902. Even if a long term series of predicate acts cannot be proved, a party may demonstrate continuity via a threat of future repetition by proving related predicate acts which "themselves include a specific threat of repetition extending indefinitely into the future," 109 S.Ct. at 2902, or "that the predicate acts or offenses are part of an ongoing entity's regular way of doing business" whether that business "exists for criminal purposes" or is otherwise "legitimate." *Id.*

In the time since *H.J. Inc.* was decided, this Court and the Fourth Circuit have both had the opportunity to consider and apply the Supreme Court's holding to various factual situations. In *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir.1989), the Fourth Circuit described the Supreme Court's "continuity plus relationship" test as "a commonsensical, fact-specific approach to the pattern requirement." [40] The Fourth Circuit upheld the district court's dismissal of plaintiffs' RICO claim on the grounds that

> "plaintiffs' allegations fail to satisfy the continuity prong of RICO's pattern requirement. Defendants' actions were

---

**39.** The difficulty led the concurrence to note "That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that [constitutionally void for vagueness] challenge is presented." 492 U.S. at 256, 109 S.Ct. at 2909 (Scalia, J., concurring). Although defendants have presented that challenge here, this Court declines to hold the statute unconstitutional in this civil application.

**40.** This reflected the Fourth Circuit's earlier statement in *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir.1988), that the issue of pattern requires a "carefully considered judgment taking into account all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur."

narrowly directed towards a single fraudulent goal. They involved a limited purpose: to defraud Menasco, Inc. and Lucky Two, Inc. with respect to their oil interests. They involved but one perpetrator: Wasserman. They involved but one set of victims: Menasco and Lucky Two. Finally, the transaction took place over approximately one year. Clearly, these acts do not constitute 'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.' [*International Data Bank, Ltd. v.] Zepkin*, 812 F.2d [149,] 155 [ (4th Cir. 1987) ]."

886 F.2d at 684.

Other cases addressing the continuity issue include *Parcoil Corp. v. Nowsco Well Service, Ltd.*, 887 F.2d 502, 504–5 (4th Cir. 1989) (Seventeen falsified reports sent over four months were not the type of continuity contemplated by *H.J. Inc.* Nor was there any threat of continuation: the relationship between the parties (and the alleged predicate acts) terminated independently of discovery by plaintiff and there was no indication that this was defendants' regular way of doing business); *Eastern Pub. and Ad. v. Chesapeake Pub. and Ad.*, 895 F.2d 971, 973 (4th Cir.1990), *cert. den.* — U.S. ——, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990) (All predicate acts occurred within a three-month period and the alleged end purpose of the acts was then accomplished; accordingly, the closed-ended scheme to defraud alleged had neither the requisite continuity or threat of continuity); *Walk v. Baltimore and O. Railroad*, 890 F.2d 688, 690 (4th Cir.1989) (Alleged predicate acts extending over ten years demonstrated requisite continuity despite closed-ended nature of alleged conduct); and *Benard v. Hoff*, 727 F.Supp. 211, 216–17 (D.Md.1989) (Alleged scheme was limited, not continuous; it "has not in the past been repeated nor is likely, from the acts alleged, to be repeated in the future").

In considering whether Mylan has alleged a pattern against defendants, the Court has not—despite Mylan's urging—attributed every predicate act to every defendant. As the Court has held that there has not been a sufficient allegation of a global conspiracy with its single plan, such attribution would be improper. The Court has, however, attributed the acts of the various agents to their corporate manufacturer employers; this is in accord with the Court's holding as to *respondeat superior.*

ATI through its agents Vegesna and Azeem is alleged to have bribed and/or paid gratuities to various FDA defendants on at least six occasions. ATI agent Vegesna is also alleged to have obstructed justice through his falsification of records. The bribery alone certainly satisfies the numerical minimum imposed by the statute and also satisfies the relationship plus continuity test laid out in *H.J. Inc.* The acts were related in their goal to improperly advance ATI's interests and were sufficiently continuous if not in themselves then in their threat of future criminality. As Mylan has alleged, it was outside investigation that led to the cessation of defendants' activities. The scheme alleged contained no inherent limitation suggesting that the bribery would have ceased absent such outside detection. Moreover, the perversion of the regulatory process quite likely posed a "special threat to social well-being." 886 F.2d at 684.

Similarly, Par and Quad through Patel and Shah are alleged to have made at least four monetary payments to the FDA defendants as well as providing them with several meals. Attribution in this instance is somewhat more problematic as Par and Quad, though parent and subsidiary, are separate corporate entities. However, Patel is alleged to be Par's agent, and Shah is alleged to be Quad's agent, and Patel and Shah are alleged to have acted together in making certain payments. Thus, the Court will assume for the purposes of this motion that all four defendants are properly held to have committed the requisite predicate acts. As before, the acts alleged constitute a pattern within the meaning of the statute as interpreted by the courts.

Akzo/PBI [41] employee Matkari is alleged to have made a single monetary payment to

---

41. Matkari is actually alleged to have been the employee of PBI not Akzo. Akzo is only named

Chang and to have paid for his meals on several occasions. Although defendants characterize the meals as de minimis, Mylan points out that the bribery statute prohibits the giving of anything of value. Although this conduct is not as extensive as that alleged above, at this preliminary stage in the litigation the Court will hold that a pattern has been alleged and allow the claim to go forward.[42]

Viterine is not alleged to have made any illegal payments to FDA defendants but is alleged to have destroyed records and made numerous false entries in the remaining records in an obstruction of justice. The alleged acts are sufficient in number, relationship and continuity to be considered a pattern.

 Quantum's employee J. Chang is alleged to have made a single $300 payment to Brancato. No other predicate acts are alleged. Mylan argues that this payment was both an illegal bribe as well as a violation of the Travel Act, 18 U.S.C. § 1952. Without addressing the issue whether Mylan sufficiently alleged a violation of the Travel Act, this Court holds that the single payment alleged cannot as a matter of law constitute a RICO pattern no matter how many statutes it violated. A swallow does not a summer make.[43] Accordingly, Mylan's RICO claims against AHP, Quantum and J. Chang must be dismissed for lack of a pattern of racketeering activity.

Each of the FDA defendants is alleged to have accepted a sufficient number of improper payments to be held to have committed a pattern of racketeering activity.

### D. The Existence of an Enterprise

" '[E]nterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

18 U.S.C. § 1961(4).

#### 1. Association-in-fact

Mylan has alleged two possible associated-in-fact enterprises; the first is the association of all of the defendants, corporate and individual, the other is the association of all of the individual defendants. Defen-

---

in Mylan's suit because it is the parent company of PBI; unlike Par, it is not alleged to have had any agents busily undermining the raison d'etre of the FDA. The propriety of piercing the corporate veil to hold Akzo in this litigation has been raised in Akzo's motion to dismiss for lack of personal jurisdiction, and will be considered in ruling on that motion. For the limited purpose of this discussion, the Court assumes Akzo is responsible but expresses no opinion on the issue.

**42.** This holding is not a little affected by Mylan's allegations regarding PBI's alleged corporate predecessor My–K, which through its agent Bae, is alleged to have had an extensive history of improper payments made to FDA officials. Akzo/PBI argues that this conduct is not properly attributable to it under the general rule that a corporation that acquires the assets of another corporation is not ordinarily liable for the liabilities of that predecessor corporation. *Smith v. Navistar Int'l Transp. Corp.*, 737 F.Supp. 1446, 1448 (D.Md.1988). This general rule is subject to exceptions, of course, so that liability will be imposed on a successor corporation where the transaction amounts to a consolidation or merger. *Id.* Mylan argues that this exception applies in this case. The facts surrounding the transferral of My–K's assets to PBI are obviously in conflict and not susceptible to resolution

on a motion to dismiss. The Court will not consider the extra-pleading references included by defendants at this stage. The tactical decisions of the United States Attorney in determining who to charge with what criminal conduct may have little to do with the legal standards for imposing civil liability.

**43.** *See U.S. v. Biaggi*, 909 F.2d 662, 686 (2nd Cir.1990), *cert den.* —— U.S. ——, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991).

"Neglia contends that the bribe and the false denial of it, though obviously bearing the requisite 'relationship' to each other, [ ... ] lack the requisite 'continuity' to establish a 'pattern.' That may well be so, but the more basic objection is that aggregating the bribe and its denial into a 'pattern' perverts the meaning of that word, at least as it is used in the RICO statute. The 'pattern' element guards against permitting RICO to be used against sporadic criminal activity. Neglia's bribe does not cease to be a sporadic offense simply because he later falsely denied committing it. If the commission of an offense and its false denial count establish a 'pattern,' then *every* offense related to a criminal enterprise would be eligible for inclusion in a pattern whenever the offender falsely denied its commission. That is not what Congress intended."

dants have raised a variety of issues regarding the sufficiency of Mylan's associated-in-fact allegations: the corporate defendants argue that corporations cannot combine to form associated-in-fact type enterprises[44]; all defendants argue that Mylan has not properly alleged a distinction between the "person" and the associated-in-fact "enterprise" as is required for its § 1962(c) claim[45]; and all defendants argue that Mylan has not alleged any ascertainable structure to the posited enterprise. Since the last proves dispositive, this Court will not address the others.

In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court discussed the concept of an associated-in-fact enterprise and distinguished between an enterprise, an entity, and a pattern, a series of criminal acts. 452 U.S. at 583, 101 S.Ct. at 2528–29.

> "The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."

*Id.*

Following *Turkette*, the Fourth Circuit in *United States v. Griffin*, 660 F.2d 996 (4th Cir.1981), further defined the proof necessary to establish an associated-in-fact enterprise.

> "Critical [ ] to charge and proof of the existence of an associated-in-fact enterprise under § 1962(c) is charge and proof of a common purpose for which the group of individuals alleged to constitute the enterprise have associated themselves."

660 F.2d at 1000.

The Court observed that association-in-fact was intended to be easier to prove than traditional conspiracy, 660 F.2d at 999, but the offenses shared certain essential similarities: "each proscribes the purposeful associations of individuals," *id.* at 1000, and in each the court must guard against the assessment of guilt solely on the basis of association rather than on an individual and personal basis. *Id.*

> "Proof of the existence of an associated-in-fact enterprise requires proof of a 'common purpose' animating its associates, and this may be done by evidence of an 'ongoing organization, formal or informal,' of those associates in which they function as a 'continuing unit.' [452 U.S. at 583, 101 S.Ct. at 2528.] The ties between the individual associates that are implied by these concepts of continuity, unity, shared purpose and identifiable structure operate precisely to guard against the danger that guilt will be adjudged solely by virtue of associations not so related. [ . . . ]"

*Id.* In *Griffin* the Court was faced with evidence of an association between several gamblers each of whom was bribing police officers to protect their illegal gambling operations. The defendants argued that they had no common purpose but "instead acted, 'each man for himself and the devil take the hindmost,' only to protect the in-

---

**44.** Defendants cite *Benard v. Hoff*, 727 F.Supp. 211, 215 (D.Md.1989), in which this Court said, with no analysis, "[c]orporations cannot under RICO associate in fact to constitute an enterprise." This statement was actually at odds with the decisions of a number of Courts of Appeals which have held that corporations can associate in fact to constitute an enterprise. *United States v. Huber*, 603 F.2d 387, 394 (2nd Cir.1979), *cert. den.* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Perholtz*, 842 F.2d 343, 352–3 (D.C.Cir.1988), *cert. den.*

488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988) (authorities listed therein). The Fourth Circuit has not yet held on the issue. *See Entre Computer Centers v. FMG of Kansas City*, 819 F.2d 1279, 1287 (4th Cir.1987).

**45.** A distinction between the "person" and the "enterprise" is necessary for a § 1962(c) claim but is not required for a § 1962(a) claim. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 841 (4th Cir.1990).

terests of his own operation." *Id.* The Court affirmed the jury's verdict, however.

> "There was adequate evidence of concerted activity by the defendants in deliberately broadening the scope, hence the total weight, of the corrupting influence to justify a finding of such a common purpose, hence of an identifiable 'enterprise' centered upon and given form by that purpose."

*Id.* at 1001.

In *United States v. Tillett,* 763 F.2d 628 (4th Cir.1985), the Court was faced with a similar scenario: defendants convicted of a § 1962(c) violation argued that the evidence established two separate and distinct conspiracies rather than a single associational enterprise. 763 F.2d at 630–1. The Court disagreed. The common purpose of the central figure and his financiers at any relevant time was making money in the illegal trafficking of marijuana; the operation was an ongoing organization in which the associates (including appellants) functioned as a continuing unit; the group had a structure within which the various associates operated according to their specific function; and the "smuggling techniques and details of operation were virtually the same from one boat importation to the next." 763 F.2d at 631.

In this case, Mylan has alleged no ascertainable structure distinct from the pattern of racketeering acts. It is not enough to argue, as Mylan does, that circumstantial proof may be sufficient. There must be some circumstantial facts alleged from which the inference of association and structure can be drawn. The only link alleged by Mylan is the fact that the defendants dealt with the same FDA employees. As discussed previously, given the structure of this section of the FDA this coincidence is unremarkable and permits no inference of association. *Griffin* is distinguishable. In that case, there was evidence of connection between the defendants: the gambler-defendants had referred the police officers apparently on the

take (actually under cover) to one another and had referred one another to the police officers. 660 F.2d at 997–8. No such connection has been alleged in this case, and without such an allegation, holding defendants to an enterprise would be assessing guilt on an improper basis. The concepts of continuity, unity, shared purpose and identifiable structure, required to prove an enterprise,

> "define the line between 'concerted action' through 'group association for criminal purposes,' for which 'combination in crime' may constitutionally be proscribed, *Callanan v. United States,* 364 U.S. 587, 593–4, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961) and less clearly related conduct that may not be so proscribed and prosecuted."

660 F.2d at 1000.

Mylan's allegations of associated-in-fact enterprises must for these reasons fail.

### 2. FDA As Enterprise

The alternative enterprise alleged by Mylan is the FDA, an entity "engaged in and whose activities affected interstate commerce." Complaint para. 100. Defendants have not argued that the FDA cannot be an enterprise within the meaning of § 1961(4),[46] instead they argue that because they did not "operate or manage" the FDA, they did not "conduct or participate, directly or indirectly, in the conduct of [the FDA's] affairs through a pattern of racketeering activity" within the meaning of § 1962(c).

In *United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979), the Fourth Circuit held that the " 'conduct or participate' language in § 1962(c) required some involvement in the operation or management of the business." 591 F.2d at 1375. In *Mandel,* the nexus between business/enterprise and the pattern of racketeering activity was the transfer of an interest in the business as a bribe.

> "There is no doubt that Security was a perfectly legitimate business, and the

---

**46.** In fact, public entities such as the FDA have been recognized as enterprises within the meaning of the statute. *See U.S. v. Baker,* 617 F.2d 1060, 1061 (4th Cir.1980) (Fourth Circuit held that county sheriff's office was an enterprise within the meaning of RICO).

simple transfer of an ownership interest in that business does not constitute the conduct of the business through a pattern of racketeering activity even if the transfer is part of an alleged payoff in a mail fraud scheme. We see no difference between this transfer and the transfer of stock or any other business interest. The transfer may even be in payment for unconnected criminal activity as the government alleges here, but this fact does not, in itself, cause the business, the interest in which is transferred, to become a racketeer influenced organization proscribed by § 1962(c)[.]"

591 F.2d at 1376.

■ Defendants reading of the Fourth Circuit's holding appears to be as impermissibly limited as the government's reading of § 1962(c) was "impermissibly broad" in *Mandel.* Both the statute and the case clearly require an actual nexus between the pattern of racketeering activity and the affairs of the enterprise, but this

"is shown when the defendant is associated with the enterprise and the pattern of racketeering activity is related to the activities of the enterprise."

*Gussin v. Shockey,* 725 F.Supp. 271, 277 (D.Md.1989) (Summary judgment on RICO granted for defendant because the association between the defendant and the enterprise "must include an aspect of purpose to violate the act" and here the relation between the defendant and the enterprise was incidental.) In *First Financial Sav. Bank v. American Bankers Ins. Co.,* 699 F.Supp. 1167, 1172–3 (E.D.N.C.1988), the district court consider *Mandel* and explained that

"this involvement in the operation or management of the business may be direct or indirect. Further, the defendant need not be employed by the alleged enterprise but may merely be associated with the alleged enterprise. [ ... ] In this case, the allegations in the complaint set forth an association between the defendant and the [enterprise] which exceeds the scope of normal business transactions and which further could show some role in the conduct of the alleged

enterprise[']s affairs as to the issuance and sale of the bonds."

The court denied defendants' motion to dismiss. *Id.* at 1173.

In two cases decided after *Mandel,* the Fourth Circuit affirmed the convictions of defendants alleged to have bribed public entity enterprises. In *United States v. Baker,* 617 F.2d 1060 (4th Cir.1980), defendant was convicted under RICO § 1962(d) for bribing the county sheriff in order to obtain protection for his houses of prostitution. The issue explicitly considered by the Fourth Circuit was whether the county sheriff's office was a proper enterprise within the meaning of RICO, and the Court held that it was. 617 F.2d at 1061. The issue of nexus was not specifically addressed, but the conviction was affirmed. In *United States v. Karas,* 624 F.2d 500 (4th Cir.1980), *cert. den.* 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981), the Fourth Circuit affirmed the conviction of a defendant accused of bribing county law enforcement officials in order to protect a gambling ring. Again, the Court held that the office was a sufficient enterprise and affirmed the conviction without addressing the nexus issue. 624 F.2d at 604.

In other circuits the issue has been specifically addressed. In *United States v. Bright,* 630 F.2d 804 (5th Cir.1980), defendant Bright was alleged to have bribed the sheriff's office (the alleged enterprise) so that the sheriff would accept bail bonds only from Bright's company. The Fifth Circuit held that Bright was "associated with" the enterprise by virtue of the "continual relationship of bribery," 630 F.2d at 830, and that Bright participated in the affairs of the enterprise through a pattern of racketeering activity as his "sole participation in the enterprise took the form of bribery of" the sheriff. *Id.* at 830–1. The Court distinguished *Mandel* as being a case in which "the pattern of racketeering activity was not linked to the alleged enterprise's affairs." *Id.* at 831. *See also United States v. Welch,* 656 F.2d 1039, 1061 (5th Cir.1981) (bribery of sheriff's office

within RICO).[47] In *United States v. Yonan*, 800 F.2d 164 (7th Cir.1986), *cert. den.* 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1987), the Seventh Circuit held that an indictment charging defendant with a violation of 18 U.S.C. § 1962(c) "by associating with the Cook County State's Attorney's Office and conducting its affairs through a pattern of racketeering activity, that activity being seven acts of bribery involving an Assistant United States Attorney," 800 F.2d at 167, charged a proper crime. The Court held that

> "the defendant need not have a stake in the enterprise's 'goals,' but can associate with the enterprise by conducting business with it, even if in doing so the defendant is *subverting* the enterprise's goals."

*Id.* (emphasis in original).

> "Here, the defendant is clearly alleged to have a business relationship with the enterprise. The relevant business of the Cook County State's Attorney's Office is to prosecute and otherwise dispose of criminal cases; Yonan's business as an attorney was to negotiate with, oppose, or otherwise deal with that office in representing criminal defendants. This alleged relationship is sufficient for the court to find that Yonan was associated with the State's Attorney's Office for purposes of section 1962(c). Moreover, the seven alleged acts of bribery clearly are sufficient to charge Yonan with con-

ducting or participating in the conduct of that office's affairs through a pattern of racketeering activity."

*Id.* at 168. *See also New York v. Joseph L. Balkan, Inc.*, 656 F.Supp. 536 (E.D.N.Y.1987) (City sewer inspectors bribed by various contractors who also submitted false permit applications to the Bureau of Sewers; these predicate acts occurred over ten year period); *New York v. O'Hara*, 652 F.Supp. 1049 (W.D.N.Y.1987) (City Manager of Niagara Falls bribed).[48]

▌Given this significant development in authority in other circuits as well as the Fourth Circuit's actions in *Baker* and *Karas* and the district courts' language in *Gussin* and *First Financial*, it seems that the Fourth Circuit's language in *Mandel* is more properly understood as referring to the facts of the case and the general requirement for some nexus between the pattern of activity and the enterprise than as requiring insider management and control, as defendants assert, in § 1962(c) cases. Accordingly, the Court will not dismiss Mylan's § 1962(c) claim based on these allegations.

### E. § 1962(a) Investment

▌In paragraph 107 of the complaint, Mylan alleges that for the purposes of its § 1962(a) claims, each defendant is a separate enterprise. Further, Mylan alleges that the defendants each used or invested

---

**47.** The Fourth Circuit cited *Welch* in *United States v. Webster*, 669 F.2d 185 (4th Cir.1982), *cert. den.* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982), when disavowing some poorly chosen language in the original *Webster* opinion, 639 F.2d 174 (4th Cir.1981). In *Webster I*, the Court had referred to "conducted" the affairs of the enterprise as synonymous with "benefitted" the enterprise. The Court recanted this approach after the Fifth Circuit's *Welch* decision, which criticized the *Webster* opinion. As the Court said in *Webster II*,

> "The problem with the approach we took immediately surfaces in cases where the enterprise is governmental in nature, and almost universally not organized for profit. *See United States v. Welch*, 656 F.2d 1039, 1061 (5th Cir.1981)."

669 F.2d at 186.

**48.** More recently the Fifth and Seventh Circuits have adopted a three-part test for determining

when there is an adequate nexus between the pattern of racketeering activity and the enterprise alleged. *U.S. v. Cauble*, 706 F.2d 1322 (5th Cir.1983), *cert. den.* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *Overnite Transport Co. v. Truck Drivers, etc. Local No. 705*, 904 F.2d 391 (7th Cir.1990) (Three part test for analyzing alleged nexus: 1. The defendant must have committed racketeering acts; 2. The defendant's position in or relation to the enterprise facilitated those acts; 3. The racketeering acts affected the enterprise, though the effect need not be beneficial.) These courts have not disavowed their earlier specific findings of nexus, however; in fact, the Fifth Circuit in *Cauble* cited *U.S. v. Welch*, 656 F.2d 1039 (5th Cir.1981), *cert. den.* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982), a law enforcement bribery case which followed *Bright* closely. 706 F.2d at 1332 n. 22.

the proceeds of racketeering activities[49] in the establishment or operation of themselves. Complaint para. 109. The corporate defendants have argued that the link between the alleged predicate acts and the obtaining, investment and use of racketeering income is too tenuous. The statute, however, does not require Mylan to specifically trace the use of proceeds.

"The key operative terms of the section, as specifically charged here, are expansive, not restrictive ones: 'use or invest,' 'any part,' 'income ... or ... proceeds,' 'directly or indirectly,' 'establishment or operation.' In combination these broad, disjunctively-phrased terms negate any requirement that the tainted income must be specifically and directly traced in proof from its original illegal receipt to its ultimately proscribed 'use or investment' by the defendant."

United States v. Vogt, 910 F.2d 1184, 1194 (4th Cir.1990), cert. den. — U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043.

The individual manufacturer defendants Matkari, Patel, Shah and Vegesna argue that their salaries cannot be considered racketeering income; that, as individuals, they cannot be considered RICO enterprises; and that the use of their salaries in their personal finances cannot be considered use or investment in the establishment or operation of an enterprise.

▇▇▇▇ Mylan has alleged and argued that the corporate employers received profits tainted by their racketeering activity and that these individuals' salaries were paid in part from these revenues. While the Court is willing to construe the derivation of income language fairly broadly,

heeding the attitude of the Fourth Circuit in Vogt, supra, it cannot be construed as broadly as this. Mylan's argument would subject any and all of the employees of the corporate defendants to § 1962(a) liability: the tainted income which Mylan alleges and on which Mylan's argument is based was derived at the corporate level and was presumably used to pay all of the corporations' employees. Mylan cannot be permitted to pursue a RICO claim on such unspecific allegations. Accordingly, Mylan's § 1962(a) claim against defendants Matkari, Patel, Shah and Vegesna must be dismissed.

### F. RICO Injury

"To make out a civil action for damages under the RICO statute a private plaintiff must demonstrate not only that the defendants have violated § 1962, but also that he has been 'injured in his business or property by reason of [the alleged] violation of section 1962.' 18 U.S.C. § 1964(c). The quoted language requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that made up the violation of § 1962." Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir.1988). Defendants in this case argue that Mylan has not suffered injury "by reason of" the alleged predicate acts and that Mylan's RICO claims should therefore be dismissed.[50]

In Brandenburg, the Fourth Circuit held that the principles of causation generally applicable to tort liability are applicable to RICO as well. 859 F.2d at 1189.

---

**49.** The proceeds of racketeering activities are alleged to be the profits from the sales of generic drugs on which defendants got improper FDA approval because of the alleged bribery. Mylan has listed the particular drugs in its complaint. Several defendants assert that they did not receive any improper approval of the listed ANDAs, that despite any payments made to FDA officials, they did not receive the swift approval alleged by Mylan. This is, of course, irrelevant to the sufficiency of Mylan's allegations.

**50.** Defendants also argue that with regard to Mylan's § 1962(a) claim, Mylan must show injury by reason of the investment of the racketeering income and not merely injury by reason of the acts themselves. This argument has been foreclosed, of course, by the Fourth Circuit's holding in Busby v. Crown Supply, Inc., 896 F.2d 833 (4th Cir.1990), that "the 'investment use' rule is flawed," 896 F.2d at 837, and rejected it. Instead, the Court referred to its holding in Brandenburg, and reiterated that "a traditional causation analysis [must be employed] in determining whether a RICO plaintiff has been injured 'by reason of' a section 1962 violation." 896 F.2d at 839.

"These require not only cause-in-fact, but 'legal' or 'proximate' cause as well, the latter involving a policy rather than a purely factual determination: 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.' As such, the legal cause determination is properly one of law for the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection."

*Id.* (citations omitted).

■ With regard to those defendants whose pattern of racketeering activity is predicated on alleged acts of bribery,[51] there is sufficient cause alleged under the principles of *Brandenburg.* The bribes given and received were allegedly received for the purpose of advancing the bribing company's ANDAs at the expense of other companies who had submitted ANDAs for the same drug. Thus, the injury caused those other companies, such as Mylan, is a foreseeable recognizable result of the predicate actions.[52]

### G. *Exemplary Damages*

Mylan has not opposed defendants' argument that punitive or exemplary damages are not available under RICO as treble damages have been provided instead. *See Southwest Marine, Inc. v. Triple A Machine Shop, Inc.,* 720 F.Supp. 805, 810 (N.D.Cal.1989) (Section 1964 provides for treble damages which are themselves punitive in character; punitive damages in addition are not appropriate); *Moravian Development Corp. v. Dow Chemical Co.,* 651 F.Supp. 144, 149–50 (E.D.Pa.1986) (No basis for allowing punitive damages in addition to treble damages). Accoridngly, Mylan's claims for exemplary damages under RICO are stricken.

---

**51.** ATI, Vegesna, Azeem, Par, Quad, Patel, Shah, Akzo, PBI, Matkari and the FDA defendants.

**52.** The relationship between Viterine's predicate acts, obstruction of justice, and Mylan's alleged

### VII. UNFAIR COMPETITION
(Count 41)

Several of the defendants have attacked count 41, Mylan's state-law claim for unfair competition and malicious interference with business relations. Mylan has sufficiently alleged the elements of these torts as defined under Maryland law. *See Cavalier Mobile Homes v. Liberty Homes,* 53 Md. App. 379, 389, 454 A.2d 367 (1983) ("Unfair competition is generally defined in Maryland as, 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods.' "); *K & K Management v. Lee,* 316 Md. 137, 154–5, 557 A.2d 965 (1989), *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 71, 485 A.2d 663 (1984) (Elements of malicious interference are "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."). Accordingly, this count will not be dismissed.

### VIII. CONCLUSION AND ORDER

In accordance with the foregoing Memorandum, it is this 15th day of August, 1991 by the United States District Court for the District of Maryland,

ORDERED:

1. That defendants' motions to dismiss shall be GRANTED in part and DENIED in part;

2. That counts 4 through 40 of Mylan's complaint are dismissed as to all defendants;

3. That count 3 of Mylan's complaint is dismissed as to all defendants;

4. That count 2 of Mylan's complaint is dismissed as to defendants Matkari, Patel, Shah and Vegesna as well as defendants AHP, Quantum and J. Chang;

---

injury may be more problematic. As Viterine has not raised the issue of causation, however, this Court declines to address it.

5. That count 1 of Mylan's complaint is dismissed as to defendants AHP, Quantum and J. Chang;

6. Mylan's claim for punitive damages with respect to its remaining RICO claims is stricken.